UNITED STATES of America, Plaintiff,

v.

SOUTHLAND MANAGEMENT CORPORATION, INC., W. Thad McLaurin, Charles C. Taylor, Jr., and Arthur W. Doty, Defendants.

No. CIV.A.3:98CV530LN.

United States District Court, S.D. Mississippi, Jackson Division.

Jan. 28, 2000.

J. Brad Pigott, U.S. Attorney's Office, Jackson, John A. Meynardie, U.S. Attorney's Office, Biloxi, MS, for Plaintiff.

Frank D. Stimley, Jackson, Craig D. Bluntson, McCoy, Wilkins, Stephens & Tipton, Rhonda C. Cooper, Attorney, Alan Walter Perry, Forman, Perry, Watkins, Krutz & Tardy, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants W. Thad McLaurin, Charles C. Taylor, Jr. and Arthur W. Doty for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff United States of America has responded in opposition to defendants' motion and the court, having considered the parties' memoranda of authorities, together with attachments, concludes that defen-

dants' motion is well taken and should be granted. There are clearly many disputes between the parties, both as to the facts and law; but based on the undisputed *material* facts of record, and the court's comprehension of and conclusions as to the relevant law, the court is of the opinion that defendants are entitled to summary judgment.

The United States, on behalf of the United States Department of Housing and Urban Development (HUD), brought this civil suit against the defendants under the False Claims Act, 31 U.S.C. § 3729 *et seq.* seeking the imposition of penalties and recovery of treble damages based on allegations that defendants, owners of the Jackson Apartments, a federally subsidized low income apartment complex in Jackson, Mississippi, knowingly presented to HUD false claims for "housing assistance payments" and/or knowingly made false statements to HUD regarding the condition of the apartments in order to get their requests for "housing assistance payments" paid or approved by HUD. Specifically, the Government alleges that from July 1995 through January 1997, defendants submitted to HUD nineteen monthly claims for payment—in the form of "housing assistance payment" vouchers, or HAP vouchers—in which they, *inter alia*, falsely certified that each subsidized apartment unit of the Jackson Apartments was "decent, safe, and sanitary." According to the Government, throughout this time period, the apartments were not "decent, safe, and sanitary," and defendants knew they were not, or at the very least, in making these certifications to HUD, acted in reckless disregard of the truth or falsity of their representations about the apartments' condition. To understand the context in which the Government's suit is brought, and the bases for defendants' motion, a general understanding of the statutory/regulatory framework of HUD's Section 8 housing programs, is helpful.

The National Housing Act was enacted to "assist private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 17151(a). To encourage private investment, the Act, *inter alia*, authorizes HUD to insure private mortgage loans used to construct low income housing, 12 U.S.C. § 17151(d)(3), and further provides for loans at reduced interest rates and with lesser borrower equity requirements, all with the goal of "'reducing the rentals necessary to service the landlord's debt obligation.'" *Christopher Village, Ltd. Partnership v. Retsinas*, 190 F.3d 310, 312 (5th Cir.1999) (quoting *Hahn v. Gottlieb*, 430 F.2d 1243, 1245 (1st Cir.1970)). To receive these benefits, the borrower/owner must enter into a "Regulatory Agreement" with HUD which gives HUD pervasive regulatory authority over the operation and maintenance of the property. *Id.* HUD's standard regulatory agreement, for example, prohibits the owner from engaging in any business other than owning and operating the property, mandates that the property be dedicated for medium and low income tenants, limits profit distribution, requires HUD approval for rent increases, and requires that the owner use the rents to maintain the property in "good repair and condition." *Id.* If an owner violates the Regulatory Agreement, HUD, after first giving the owner notice and an opportunity to correct the violation, may declare the property in default, accelerate the mortgage and foreclose on the property. *Id.*

"Since most tenants of low income are on welfare and cannot afford to pay the full contract rental price, Congress created the Section 8 housing program to subsidize their rent." *Id.* at 313. *See also* 42 U.S.C. § 1437f ("For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section."). "'Under the program, tenants make rental payments based upon their income and ability to pay; [HUD] then

makes assistance payments' to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a 'contract rent' agreed upon by the landlord and HUD.'" *Christopher Village*, 190 F.3d at 313 (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12, 113 S.Ct. 1898, 1900, 123 L.Ed.2d 572 (1993)).[1] In other words, HUD subsidizes Section 8 tenants' rent by "housing assistance payments," which are implemented through "Housing Assistance Payment Contracts" entered into between HUD and the property owners. *Id.* These contracts, which "extensively regulate" the owner's management of the property, set the maximum allowable rent the owner may charge and the subsidy amount to be paid by HUD in order to enable the tenants to lease "decent, safe, and sanitary housing," and thus require that the owner maintain the property in a "decent, safe, and sanitary" condition.

To receive the housing assistance payments, property owners submit to HUD each month an "Application for Housing Assistance Payments"—or HAP voucher—in which they provide information regarding, *inter alia*, the tenants, number of units for which payment is requested, the contract rent amount, amount of rent payable by the tenants, and total amount of housing assistance payment requested. The HAP vouchers include an "Owner's Certification," by which the owner, or the management agent on behalf of the owner, certifies that the data supplied is correct and computed according to the Section 8 contract and applicable rules and regulations, that no unauthorized payments have been received, and, as is of paramount relevance in the case at bar, that the dwelling units are in "Decent, Safe, and Sanitary condition."

Turning, then, to this case, the record reveals that in approximately 1980, defendants Doty, McLaurin and Taylor formed a partnership, known as Jackson Apartments, Ltd., for the purpose of owning a rehabilitating the Jackson Apartments in accordance with HUD's "Section 8 Substantial Rehabilitation Program." To fund their construction/renovation of the Jackson Apartments, a 120–unit complex that had originally be constructed in the 1940s, the Partnership, in addition to an approximate $200,000 investment by the partners, executed a $2.4 million note secured by a mortgage insured by HUD and entered into a standard HUD "Regulatory Agreement." The property was originally managed by defendants, through a managing company they formed for that purpose, but in December 1983, the Partnership contracted with Southland Management Company, Inc. (Southland) to provide management services for the Jackson Apartments. Southland managed the property throughout the period of time covered by the Government's complaint and, on the owners' behalf, submitted to HUD each month a HAP voucher which included the certification now claimed by the Government to have been false, namely, that the dwelling units covered by the voucher were in "Decent, Safe, and Sanitary condition."[2] The Government submits that each of the nineteen HAP vouchers submitted by, or on behalf of the owner defendants from July 1995 to January 1997, constituted a false claim under the False Claims Act, and the certifications thereon as to the condition of the property as "Decent, Safe, and Sanitary" was a false statement made to defendants to get payment of their HAP vouchers approved by HUD.

According to the Government, over the years, defendants had allowed the physical condition of the Jackson Apartments to

**1.** There is not one Section 8 "program," but a number of programs and subprograms. While the specific rules and eligibility requirements for particular programs vary somewhat, all of the Section 8 programs are intended to provide low income tenants with affordable decent, safe and sanitary housing, and all have the same basic attributes.

**2.** Southland was also made a defendant in this suit, but was dismissed after reaching a settlement agreement with the Government.

deteriorate substantially, so that by July 1995, and continuing through January 1997, the Jackson Apartments were in a deplorable condition, as evidenced by the annual physical inspection reports prepared for HUD by its contract inspector, along with tenant affidavits.[3] The Government maintains that the confluence of the numerous defiencies which existed at the apartments rendered them apartments indecent, unsafe and unsanitary, and that defendants' contrary certifications to HUD were obviously false, were known by defendants to be false, or made with reckless disregard for their truth, and were made for the purpose of getting HUD to approve payment on defendants' HAP vouchers, so that defendants may properly be held liable for penalties and treble damages under the False Claims Act.[4]

In the court's opinion, as discussed more fully *infra*, because it is apparent from the undisputed record evidence that HUD was aware of the condition of the property during the time period at issue, and that it did not and/or would have approved payment on the vouchers regardless of the condition of the property, it follows that defendants' certifications were not "mate-

rial" to HUD's decision to continue housing assistance payments to defendants pursuant to their HAP vouchers. Moreover, the fact that HUD knew the condition of the property coupled with the irrefutable fact that defendants, as HUD well knew, themselves were fully cognizant that HUD was aware of the condition of the property, preclude a finding that defendants "knowingly" made a false statement and/or claim to HUD.

Under the False Claims Act (FCA), any person who

(1) knowingly presents ... [to the government] a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes ... a false record or statement to get a false or fraudulent claim approved by the Government. . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person . . .

31 U.S.C. § 3729(a).[5]

In this case, defendants have asserted a variety of grounds upon which they contend that summary judgment is in order.

---

**3.** The inspection reports describe roach and rodent (rat/mouse) infestation; doors on some buildings and individual apartments that would not close; some windows that would not open/close and/or which lacked functioning locks; some damaged/missing/broken receptacles/switches/covers; some damaged exterior lights with exposed wires; inoperable bathroom exhaust fans in some units; lack of charged fire extinguishers in some units and in laundry room; damaged vinyl siding on buildings, including holes and tears; chipped and rusted metal handrails; and some damaged/broken interior doors, as well as other more minor items, such as broken floor tiles, rusted medicine cabinets, rusted oven gaskets and missing light globes in some units. These conditions are confirmed by the tenant affidavits.

**4.** Ultimately, HUD foreclosed and the property was sold at auction in approximately August 1998.

**5.** While defendants' motion indicates that they have been sued only under subsection

(1), the Government in its response points out that it has alleged violations of both subsection (1), covering false claims, and (2), covering false statements made to get false claims paid. The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property ... [where] the United States Government provides any portion of the money or property." Defendants' "claims" are the monthly HAP vouchers they submitted to HUD; and what the Government alleges makes the defendants' "claims" false is that defendants certified that the property was in a "decent, safe, and sanitary condition," as required by their HAP contract with HUD and by HUD regulations. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997) (holding that "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."). The alleged false "statement" is the very same

They argue, for example, that the governing standard, "decent, safe and sanitary," is not defined in the HAP vouchers they submitted or in any of defendants' contracts with HUD, and that since the standard, left undefined, is plainly ambiguous and susceptible to varying interpretations and subjective judgment, one could not rationally conclude that their statements that the apartments satisfied this standard were "knowingly" "false." They also argue that, even assuming the proper definition of the phrase "decent, safe, and sanity" is that proffered by the Government, the record proof does not establish that the units did not, in fact, meet this standard; and further, that even if the court deemed the proof sufficient to show that the units were not "decent, safe, and sanitary," or to create a genuine issue of fact on that point, the Government has not adduced sufficient evidence that defendants knew, or should have known, of those conditions which the Government submits rendered the apartments indecent, unsafe and unsanitary. Defendants' principal arguments in support of their request for summary judgment, though, relate to HUD's policies and practices with respect to the payment of HAP vouchers and to HUD's own knowledge of the condition of the Jackson Apartments during the relevant time period and the effect of such knowledge on the Government's case against them. In this vein, defendants

argue the Government can establish neither the "materiality" of the HAP certifications nor that in signing the certifications, the defendants "knowingly" made a "false" statement or claim to HUD. The gist of their argument is that even *if*, as contended by the Government, the property was not "decent, safe, and sanitary"—and defendants do not concede that it was not [6]—nevertheless, it is manifest that their certifications were not "material" to HUD's decision to pay their HAP vouchers as the undisputed evidence reveals that it is HUD's policy and practice to make Section 8 housing assistance payments even on properties that might not satisfy HUD's comprehension of "decent, safe, and sanitary," since the owners of such properties are typically dependent upon the HUD payments in order to correct deficiencies and HUD expects that such owners will use the housing assistance payments to effect necessary repairs and maintenance. Defendants argue further with respect to the Jackson Apartments in particular, that their allegedly false certifications as to the condition of the property patently were immaterial to HUD's decision to allow payment on the HAP vouchers in that HUD was actually aware at the time of defendants' submission of the vouchers of the very conditions which HUD now claims rendered the property indecent, unsafe and unsanitary. In a related vein, defendants argue that they cannot be found to

certification, i.e., that the property was in a "decent, safe, and sanitary" condition. *See id.* at 903 (observing that "the FCA imposes liability not only on any person who submits a false or fraudulent claim for payment, but also on any person who knowingly makes a false statement in order to get a false or fraudulent claim paid"). Whether the Government has sued under one or both FCA provisions is ultimately inconsequential, for the court's analysis of the dispositive substantive issues is the same under both provisions.

**6.** In its memorandum response to defendants' motion, the Government chastises defendants for having taken contradictory positions in its motion (and asking the court to make contradictory findings), and in particular, for their having argued on the one hand that they

knew their certifications were true and yet having also argued that the Government knew the statements were false; for having argued that they never knew what the phrase "decent, safe and sanitary" meant while insisting at the same time that the physical condition of the apartments satisfied the definition of those words; and for having argued that HUD did not know what was meant by the phrase "decent, safe and sanitary" while asserting that HUD knew that the "decent, safe and sanitary" standard was not met by the property at the time defendants' HAP vouchers were submitted. The court, however, understands that defendants have asserted *alternative* arguments and, notwithstanding the Government's insinuations, perceives nothing untoward or improper in defendants' approach to presenting their positions for the court's consideration.

have made "false" claims or to have "knowingly" submitted false claims by certifying that the property in question was "decent, safe and sanitary" since the Government, and specifically HUD, was fully aware of the condition of the Jackson Apartments during the relevant time period as a result of periodic inspections of the property conducted for and on HUD's behalf, and because defendants themselves always knew that the government, and

specifically HUD and the United States Attorney, had full knowledge of the conditions of the property when the HAP vouchers were submitted and thus could not have thought they were hiding anything from the government. In the court's opinion, defendants are correct on all counts.[7]

■ As an initial matter, the Government argues, in response to defendants'

7. In the court's view, there is at least arguable merit in defendants' position on other points, as well. For example, there is nothing in the contract documents or HAP vouchers, or in the applicable HUD regulations, which specifically states what is meant by the phrase "decent, safe, and sanitary." The Government has contended that what is "decent, safe, and sanitary" is determined by reference to the "minimum Housing Quality Standards" (HQS) set forth by HUD primarily in 24 C.F.R. § 886.113; that is, according to the Government, housing which meets the minimum HQS is "decent, safe, and sanitary," and housing which fails to meet these HQS is not "decent, safe, and sanitary." However, the route by which the Government has come to this conclusion is not altogether direct. Defendants have pointed out that the HQS upon which the Government relies in declaring the subject apartments not "decent, safe, and sanitary" did not even apply to the Section 8 program in which they participated—the Section 8 Housing Assistance Payments Program for Substantial Rehabilitation—but applied to a different program, the Section 8 Loan Management Set Aside Program, 24 C.F.R. §§ 886.101–138. The Government nevertheless maintains that the HQS, even though not directly applicable to the Substantial Rehabilitation program, set the standard for what is "decent, safe, and sanitary" for this program, reasoning that since the applicable regulations provide for periodic inspections by HUD to determine whether the units are in a decent, safe and sanitary condition, 24 C.F.R. § 881.612, and since HUD's contract inspector commonly uses the minimum HQS as a key part of the inspection process to determine whether apartment units are "decent, safe, and sanitary," then it logically follows that the standard HUD has applied during the annual physical inspections, i.e., whether the units meet the minimum HQS, is the standard for gauging whether the units are "decent, safe, and sanitary." By the Government's argument, then, it would seem that the "decent, safe, and sanitary" standard is defined by reference to whatever standards the contract inspector has chosen to employ

to evaluate whether property is "decent, safe, and sanitary." This hardly seems a reasonable position.

Taking another approach to this issue, the Government, citing 24 C.F.R. § 880.201, argues that the regulations governing the Substantial Rehabilitation Program provide that housing which HUD agreed to accept for participation in the program, based upon an initial determination that it was "decent, safe, and sanitary," continues to be decent, safe and sanitary if it is in a condition substantially the same as at the time of acceptance. HUD reasons that since the Jackson Apartments were obviously not in "a condition substantially the same as at the time of acceptance," i.e, when the HAP contract was entered, then it follows that they do not continue to be "decent, safe, and sanitary." It is apparent to the court, though, that such a provision as referenced by the Government would not be intended to limit what will qualify as "decent, safe, and sanitary" to the condition of the property existing at the time of HUD's original acceptance of the property, but rather would stand as a recognition that after its acceptance of a given property into the program, so long as the property continues to be maintained in substantially the same condition, HUD cannot thereafter disqualify the property on the ground that it is not "decent, safe, and sanitary." The language upon which the Government thus relies does not purport to define what will qualify a property as "decent, safe, and sanitary."

Moreover, a number of courts have considered "[t]he [phrase] 'decent, safe, and sanitary' housing [to be] a subjective term at best." *Perry v. Housing Auth. of Charleston*, 664 F.2d 1210, 1218 n. 13 (4th Cir.1981) (quoting *Boston Pub. Housing Tenants' Policy Council, Inc. v. Lynn*, 388 F.Supp. 493 (D.Mass.1974)); *Goode v. St. Stephens United Methodist Church*, 329 S.C. 433, 446, 494 S.E.2d 827, 834 (Ct.App.1997). And others have indicated that FCA liability cannot be predicated on a statement that cannot be either objectively true or false. *See Tyger Constr. Co., Inc. v. United States*, 28 Fed. Cl.

argument respecting materiality, that in light of the Supreme Court's decision in *United States v. Wells,* 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), materiality is not even an element of the Government's case in a civil FCA suit. The Government thus reasons that even if it could be shown that HUD was aware of the condition of the apartments when the voucher payments were approved, or that HUD's policy was to make housing assistance payments without regard to the actual condition of the property, such proof would be irrelevant. All that must be shown, according to the Government, is that the defendants' certifications were false. The court, however, does not share the Government's view that materiality is not an element of a *civil* FCA case, notwithstanding the Supreme Court's opinion in *Wells, supra,* in which the Court determined that "materiality" is *not* an element of a *criminal* False Claims Act offense.

The court recognizes that this may be a debatable conclusion in light of *Wells,* and in fact, the one court that has addressed this issue post-*Wells* has opined that consistent with *Wells,* in a civil FCA case, as in a criminal FCA prosecution, materiality is not an element of the Government's case. *See United States ex rel. Roby v. Boeing Co.,* 184 F.R.D. 107 (S.D.Ohio 1998). This court, however, concurs in the well-reasoned analysis and opinion appearing in the paper presented at the American Bar Association's 1998 National Institute on the Civil False Claims Act and Qui Tam Enforcement, that the conclusion most courts had reached preceding *Wells,* that materiality is an element of civil FCA claims, remains correct after *Wells.* *See* Clarence T. Kipps, Jr., Robert K. Huffman, Peter B. Hutt II, *Materiality as an Element of Liability Under the False Claims Act,* N98CFCB ABA–LGLED 3–37 (1998), and cases cited therein.[8] That

35, 37 (1993); *Boisjoly v. Morton Thiokol, Inc.,* 706 F.Supp. 795, 810 (D.Utah 1988).

Having said all this, though, the court recognizes that although an assessment of whether property qualifies as "decent, safe, and sanitary may involve subjective judgment, there are cases in which property would not qualify as 'decent, safe and sanitary' under any conceivable definition of those terms." *See United States v. Intervest Corp.,* 67 F.Supp.2d 637 (S.D.Miss.1999). The court need not decide whether that is the case here, or more accurately whether this would otherwise present a genuine issue of fact for trial, since even assuming that the property was not decent, safe and sanitary, and further assuming arguendo that defendants knew it was not, the Government still could not prevail against them in this case.

8. Defendants apparently have also found the reasoning of these writers persuasive, as in their memorandum, they have quoted extensively from the referenced paper (though without benefit of citation to the authors). The presenters of the paper opine that,

[a]lthough the word "materiality" appears nowhere in the text of the statute, it is implicitly embedded in all four of the principal liability provisions. Section (a)(1) imposes liability on those who submit "false claims" for "payment or approval" by the Government. As a matter of logic, it cannot be that a claim is "false" if it would have been paid or approved notwithstand-

ing the misconduct alleged to have occurred.

Section (a)(2) imposes liability on those who make or use "a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). If a record or statement were not material to the Government's decision to pay or approve a claim, it could not be used "to get" such a claim paid or approved.... Section (a)(3) is subject to the same analysis, since it imposes liability on those who conspire "by getting" a false or fraudulent claim allowed or paid.

Finally, section (a)(7)—the "reverse false claims" provision—also implicitly incorporates a materiality requirement. It imposes liability on those who use false records or statements "to conceal, avoid, or decrease an obligation to pay" the Government.... A false statement cannot be used "to conceal, avoid, or decrease" a financial obligation if it is not material to the Government's belief as to whether a person owes such an obligation, or to its decision whether to seek payment.

N98CFCB ABA—LGLED B–38–39. The authors recount the history of the FCA, including aspects of the FCA's legislative history and pertinent judicial decisions, and conclude that the focus of the FCA has always been on conduct or omissions that may cause financial loss to the federal treasury. *Id.* at B–42. They then address the *Wells* decision, explaining as follows:

is, this court considers proof of materiality to be essential to the Government's case. And here, the court is of the opinion that the Government, in response to the defendants' motion, has failed to come forward with sufficient evidence to create a genuine issue of fact on this element.

■ A false statement or claim is "material," according to the Supreme Court's definition in *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988), if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." *See also United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453, 1460 (4th Cir.), *cert. denied*, 522 U.S. 916, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997) (quoting *United States v. Norris*, 749 F.2d 1116, 1122 (4th Cir.1984)) ("[T]he materiality of the false statement turns on 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.'"). One might naturally tend to presume that by its very nature, defendants' certification regarding the condition of the property for which the HAP vouchers was submitted would neces-

sarily be material to HUD, given the fact that the purpose of the Section 8 housing programs is to provide affordable "decent, safe, and sanitary" housing to low income tenants, the fact that HUD's regulations require that Section 8 housing be maintained in a "decent, safe, and sanitary" condition and the fact that the HAP contract between HUD and defendants specifically required defendants' certification that the Jackson Apartments were so maintained in order to for defendants to be entitled to receive the contracted-for housing assistance payments from HUD. Indeed, one might be inclined to view such a certification as material as a matter of law; but the record, as well as the Government's own arguments on the motion, reveals the absence of proof of materiality as a matter of fact.[9]

■ Defendants' contention in the case *sub judice* that HUD's decision to pay pursuant to defendants' HAP vouchers was not linked to their certification as to the condition of the apartments is amply supported by the undisputed evidence. It is clear from the evidence that HUD, in accordance with the terms of its standard

The conclusion that the FCA includes a materiality requirement can be squared with the Supreme Court's decision in [*Wells*]. In that case, the Supreme Court addressed the question of whether materiality is an element of the crime of "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action" of a federally insured bank, 18 U.S.C. § 1014. The Court concluded that materiality was not an element of the crime, reasoning that the statute did not mention materiality and that "the term 'false statement' carries no general suggestion of influential significance." *Id.* at 490, 117 S.Ct. 921 (citing *Kungys v. United States*, 485 U.S. 759, 781, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). Turning to the legislative history of § 1014, the Court was also swayed by the fact that Congress had expressly included materiality in other false statements provisions in the criminal code, and had deleted materiality from others. *Id.* at 491–97, 117 S.Ct. 921.

By contrast, the civil provisions of the FCA do imply materiality. While the term

"false statement" does not connote materiality, the term "false claim" necessarily does. A "statement" can be determined to be true or false, regardless of whether the statement would have any material (influential) effect on its intended recipient. But a "claim" cannot be determined to be true or false without consideration of whether the decisionmaker should pay the claim—that is, a claim is "false" only if the Government or other customer would not pay the claim if the facts about the misconduct alleged to have occurred were known. Moreover, the FCA is further distinguished by the lengthy history recounted above, which demonstrates that Congress has always understood the FCA to include materiality as an element of liability.

*Id.* at B–46.

9. The question of materiality is a mixed question of law and fact, and is for the court to decide. *See United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453, 1460 (4th Cir.), *cert. denied*, 522 U.S. 916, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997).

HAP contract, *may* elect to discontinue housing assistance payments if an owner, after notice by HUD that the property is not "decent, safe, and sanitary," fails to implement a corrective action plan acceptable to HUD. However, it is equally clear not only that that discontinuance of payments is not required but also that even when HUD considers that a property is not "decent, safe, and sanitary," it is HUD's normal practice, in keeping with the parties' respective rights and obligations under the HAP contract, to allow owners to continue to receive subsidies while working to correct deficiencies that HUD has identified. Indeed, it is evident from the proof that HUD makes housing assistance payments with the expectation that the owner/recipients will use those payments to bring their property up to standard. Further, as the Government points out in its own submission, in view of the practical realities of Section 8 housing programs, HUD often elects to continue payments for a particular property despite knowledge that the property, contrary to the owners' HAP voucher certification, does not meet HUD's "decent, safe, and sanitary" standard since the alternative— discontinuance of payments—may work to the detriment of the tenants.[10] The point, of course, is that because the evidence reflects that HUD, as a matter of policy and practice, admittedly routinely makes Section 8 housing assistance payments to owners of Section 8 property irrespective of whether the property is in a "decent, safe, and sanitary" condition, then the owners' certification as to the condition of the property would not be "material" to HUD's decision to pay.

Though this would seem evident, the Government nevertheless maintains that HUD's actions or inaction in another case, or in other cases, have no bearing on this case, in which the evidence reflects that defendants' certifications that the property was in a "decent, safe, and sanitary" condition were material, showing, as it does, that HUD would not have paid the vouchers but for defendants' signed certifications. In support of its position, the Government points to the deposition testimony of Quinton Lewis, the HUD employee who actually reviewed and approved defendants' HAP vouchers, who testified that he would not have approved the vouchers for payment had the certifications for payment not been signed by defendants or their management agent. In the court's opinion, however, Lewis's testimony does not suffice to create a triable issue of fact as to the *substantive* materiality of defendants' HAP certifications. Lewis's testimony stands as proof only of the fact that HUD required that owners submit to HUD a signed HAP voucher as prerequisite to HUD's authorization of housing assistance payments—not that the truth or falsity of anything contained therein affected, or had a tendency to influence the decision whether to pay. Simply put, there is nothing in the record to show that Lewis, or anyone else with HUD, took into account the actu-

**10.** In its brief, the Government explains that for practical reasons, it is often better to make housing assistance payments (or as it puts it, to not disapprove vouchers) than not, even when HUD knows that the property is not in decent condition, since a decision to withhold payment will rarely harm the owner but can easily cause great detriment to the tenants, i.e., the very persons Section 8 programs are intended to benefit, whose housing conditions will not improve if the owner's cash flow decreases and who ultimately may be altogether deprived of affordable housing of any sort if the owner lacks funds with which to make improvements to the property *and* to pay the mortgage. The Government takes the position that even if HUD, for these or other policy reasons, were to elect to continue payments for a particular property despite knowledge that the property does not meet HUD's "decent, safe, and sanitary" standard, defendants' certification would still be "material" and there still would be an unbroken "chain of causation" between the defendants' false certification and damage to the treasury. This contention has no merit, for a statement which is not capable of influencing, or has no tendency to influence HUD's decision is not material; and a decision guided by the described policy considerations is not affected by the truth or falsity of the owners' certification as to the condition of the property.

al substance of the certifications in deciding whether to approve the vouchers.[11] In fact, the evidence is to the contrary, for the evidence plainly shows that HUD did not consider defendants' certification—or more pertinently, the truth or falsity of the "decent, safe, and sanitary" certification—in making its decision to approve defendants' HAP vouchers. In this regard, defendants submit, and the evidence shows, not only that it is HUD's policy and regular practice to continue HAP payments even when property is not "decent, safe, and sanitary," but that with respect to the Jackson Apartments in particular, HUD paid defendants' HAP vouchers knowing that the certifications were false, or rather, knowing of the conditions which the Government now alleges made the certifications false.

On this issue, the evidence positively demonstrates beyond reasonable question that at the time of defendants' submission of the challenged vouchers and HUD's approval of those vouchers, HUD, based on its own annual inspections of the property, knew full well of the very conditions of the property which it now claims made the property not "decent, safe, and sanitary."[12] HUD, through its contract inspector, Management Solutions of America, Inc., conducted annual inspections of the Jackson Apartments for each of the years defendants' HAP Contract was in effect; and for each of the years from August 1993 to May 1997, based on conditions found to exist at the property by HUD's inspector,[13] the apartments received "below average" or "unsatisfactory" physical inspection reports from HUD. HUD's inspector furnished to HUD's project manager responsible for the apartments a copy of his inspection report in which he detailed his specific findings and indicated repairs which needed to be made in order that the property would satisfy HUD's minimum housing quality standards.[14] Vicki Gross, the project manager for the time period at issue, in turn, furnished the inspection report to her superiors who, in turn, forwarded the inspection reports to defendants or their managing agent, and advised defendants and/or their agent of those repairs which were required to be made and requested that defendants and/or their agent inform HUD of the actions that would be taken, along with a timetable, to correct the deficiencies which HUD had identified. At her deposition, Vicki Gross, who testified as HUD's representative, explained that properties receiving "below average" and "unsatisfactory" physical condition ratings in inspection reports are not "decent, safe, and sanitary." And indeed, the conditions upon which the Government makes its affirmative allegation that the Jackson Apartments were not in a "decent, safe, and sanitary" condition are those same specific deficiencies which HUD's inspector identified and which led him to assign the apartments the "below average" and "unsatisfactory" ratings. From this evidence, there can be no question but that HUD was fully aware of the conditions of the apartments, and specifically, of those deficiencies which it asserts made the apartments not "decent, safe, and sanitary." And yet HUD, which was aware that defendants continued to submit HAP vouchers and receive payments throughout this time, allowed those payments to continue. HUD's knowledge of the true conditions utterly belies HUD's contention that the certifications were material,[15] confirms HUD's policy and prac-

---

11. Lewis himself testified that he had not read the certification in any depth, and had never heard of the phrase "decent, safe, and sanitary" until the date of his deposition.

12. The HUD regulations applicable to the Section 8 Substantial Rehabilitation Program provide for annual physical inspections to ensure compliance with the "decent, safe, and sanitary standard," 24 C.F.R. § 880.612.

13. *See supra* note 3.

14. *See supra* note 7.

15. In a case substantially like this one, *United States v. Intervest Corp.*, 67 F.Supp.2d 637 (S.D.Miss. 1999), the Government, on behalf of HUD, sued Intervest, the managing company for Metro Manor, a Jackson apartment complex, under the False Claims Act contend-

tice of allowing housing assistance payments on properties that it knows are not decent, safe and sanitary, and dooms its claim against defendants.

 Defendants argue that in addition to the failure of proof of materiality, the Government also cannot demonstrate that there was any "knowing" "false" statement or claim by defendants in view of the fact of HUD's knowledge of the condition of the property, coupled with the proof of defendants' contemporaneous awareness of HUD's knowledge as a result of the communications between HUD and defendants on the subject. While the FCA does not require proof that the defendants acted with a specific intent to defraud, it does requires that the defendants have acted "knowingly," meaning that they had actual knowledge that the information was false, or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b) (person acts "knowingly" if he or she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."); *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999). Thus, to avoid summary judgment, a FCA plaintiff must produce evidence to support an inference of a knowing fraud. *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995), *cert. denied,* 516 U.S. 1043, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996) (quoting *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416 (9th Cir.1991)) (" 'The requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence."); *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992). In this case, the defendants submit not only that HUD knew the condition of the property, but that defendants, as evidenced by the record of communication between HUD and defendants and/or their management agent through-

ing that Intervest's signed certifications on 53 HAP vouchers that Metro Manor was in a "decent, safe, and sanitary" condition constituted false claims. Though Judge Barbour concluded that during the relevant time, the property at issue was not "decent, safe, or sanitary," he nevertheless entered summary judgment for Intervest since he further concluded that the certifications were not "substantively material to the decision to pay the HAP." He pointed out that the inspection reports generated by the contract inspector rated the property as "unsatisfactory" and "below average" which, according to HUD's Vicki Gross's understanding, meant that the property was not "decent, safe, and sanitary." Moreover, Brenda Mason, the official who actually authorized the HAP payments on Metro Manor, had testified that, based on her inspections of the property, she believed the property was "not decent, safe and sanitary." Indeed, Mason testified that she had discussed the problems she had seen with a HUD representative, to whom she explained that she did not consider the apartments "decent, safe, and sanitary," and asked if HUD could perhaps abate payments on the apartments. She was told that could not be done. Judge Barbour concluded that "HUD was [clearly] unconcerned with the apparent discrepancy between the HAP Voucher certifica-

tion and the actual condition of the property and intended to continue the payments."

In *Intervest,* as here, there was clear, uncontroverted proof that while HUD's receipt of a signed HAP voucher was a prerequisite to payment by HUD, the actual condition of the apartments (and defendant's certification of their condition, whether true or false) had no bearing whatsoever on whether payments on the HAP vouchers would be approved. The Government argues that *Intervest* is distinguishable because there, the individual who approved the voucher payments had personal, first-hand knowledge that Metro Manor was not in a "decent, safe, and sanitary" condition and yet approved the payment. The court considers this a distinction without a difference. The fact is, in this case, responsible HUD officials knew the condition of the apartments, as related to them by HUD's contract inspector, and knew that in their opinion, the housing provided by defendants was not "decent, safe, and sanitary." And they had the authority to allow HAP payments to continue despite the condition of the apartments or to discontinue the payments. As in *Intervest,* they chose to allow the payments to continue.

out the relevant time period, were aware of HUD's knowledge of the facts and thus did not "knowingly" make any false statements or claims to HUD. The evidence in this regard shows that each year, HUD sent its inspection report to defendants along with correspondence requesting defendants to advise HUD of corrective actions they would take to address HUD's concerns. And each year, defendants responded to HUD's inquiries and requests, explaining what had been done and what, if anything, would be done to address HUD's concerns.[16] In addition to the proof regarding defendants' communications with HUD on the subject of the apartments, the record also discloses that during the time frame at issue, the United States Attorney's office was also in communication with defendants about the property, and had specifically threatened to filed the present suit against defendants for violations of the FCA based on information contained in the physical inspection reports. Based on the undisputed evidence, and specifically the record of HUD's knowledge, as detailed *supra, together with* the proof of communications between HUD and defendants concerning the problems at the apartments, there could be no reasonable finding that defendants acted knowingly.[17] *See United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991) (observing that knowledge possessed by officials of the United States may be "highly relevant" to show "that the

defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir.1999) (finding that there could be no inference of knowing falsity where evidence government agency approved defendant's grant application even when it knew from official's direct inspection that program in question was "not entirely up to snuff," and further showed that defendant was cooperating with the FTA to bring GBT into full regulatory compliance).

For its part, the Government argues that a conclusion that defendants "knowingly" made false statements/claims and/or that the defendants' false statements/claims were material is not undermined by HUD's alleged knowledge about the apartments since HUD's knowledge was obviously incomplete. There were, the Government notes, only two inspections performed by HUD contractors, and the inspectors only looked at a small percentage of the units. The Government thus concludes that "[t]he ongoing and continuous indecency of the condition of the Jackson Apartments was not fully revealed on the once annual inspection reports performed by independent contractors and eventually submitted to HUD.... [T]hese reports revealed the deficiencies of a small percentage of the units as of only one day each year."[18] Yet it is upon these very inspection reports that the Government principally bases its assertion that

---

**16.** The court notes that though HUD now contends that the conditions found by its inspector to exist at the property during these annual inspections rendered it indecent, unsafe, and unsanitary, it is undisputed that at no time in its correspondence and communications with defendants and/or their agent did HUD advise defendants that it considered the property not to be "decent, safe, and sanitary."

**17.** While the Government now objects, after the fact, that defendants' responses were cursory and inadequate, HUD did not pursue the matter or advise defendants that it considered their responses, or plans to correct the deficiencies, to be other than sufficient.

**18.** The Government states, disingenuously in the court's estimation, that "[b]ecause these reports revealed deficiencies of a small percentage of the units as of only one day each year, HUD employees made several requests for more information from the owners." The record clearly shows that HUD did not request more information from the owners regarding the actual condition of the apartments; HUD requested more information about what defendants planned to do to remedy the conditions of the apartments of which HUD was aware.

throughout the relevant time period (the nineteen months from July 1995 through Jaunary 1997), the Jackson Apartments were not decent, safe and sanitary.[19] Suffice it to say, if the Government deems those reports sufficient now to sustain its burden to prove that the apartments were not "decent, safe, and sanitary," then they were obviously sufficient to inform HUD of the true condition of the apartments at the time defendants were submitting the challenged vouchers.[20]

The Government submits that in any event, its claim for the statutory penalty survives defendants' motion. In this vein, it argues that proof of materiality could only be relevant, if at all, to the Government's claim for *damages* on account of a violation of the FCA and has no bearing on its claim for recovery of the statutory penalty. It reasons that because the remedies provision of the FCA distinguishes between civil penalties, which are recoverable "solely upon proof that false claims were made, without proof of any damages," S.Rep. No. 345, 99th Cong., 2d Sess., at *8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273, and the treble damages provided by the Act, which the Government may recover only upon proof as to the damages it suffered "because of" the defendants' false statements, 31 U.S.C. § 3729(a), it follows that the Government's claim is viable, and summary judgment for defendants improper, even in the absence of proof of materiality. *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991)(citing *Rex Trailer Co. v. United States*, 350 U.S. 148, 153, n. 5, 76 S.Ct. 219, 222, n. 5, 100 L.Ed. 149 (1956)) ("No damages need be shown in order to recover the penalty."). In the court's opinion, the Government's argument fails for at least two reasons. First, it may be true that "the conduct of knowledgeable Government officials affects [only] the extent to which the Government is injured-i.e., the extent to which the Government relied to its detriment-and thus may [only] impact the measure of damages under the Act," and that the Government's claim for statutory penalties "in no way may be affected by the conduct of knowledgeable Government officials." Wilson, Neal J., *The Government Knowledge "Defense" to Civil False Claims Actions*, 24 Pub.Cont.L.J. 43 (1994). However, while the concepts of materiality and reliance, or causation, are related, they are not coextensive, and a statement or claim can be material, i.e., *capable of* influencing action, without actually inducing reliance or causing damage. Here, the proof not only establishes that knowledgeable HUD officials did not, in fact, rely on defendants' certifications, and

---

19. The court notes that in addition to the physical inspection reports, the Government has submitted as evidence of the condition of the Jackson Apartments a number of affidavits from tenants of the apartments during the time period at issue in which tenants describe conditions they encountered. With one possible exception, the conditions they identify are precisely the conditions detailed in the physical inspection reports prepared by HUD's contract inspector and thus add nothing of substance to the information imparted to HUD via the physical inspection reports. While there is but a single reference in one of the physical inspection reports to rodent infestation, a number of these tenants describe problems with rats and mice. There is, however, nothing to suggest that the defendants or their agents knew or should have known of this situation. There is nothing to suggest that any tenant ever complained of this problem and, in fact, reports prepared by Ms.

Gross during the relevant time period indicate "acceptable tenant satisfaction."

20. The court notes that in *Intervest*, in the face of Brenda Mason's direct testimony that she did not consider the Metro Manor apartments decent, safe and sanitary, the Government similarly argued that Mason had incomplete information about the conditions at Metro Manor, in that she did not receive all of the physical inspection reports and was only physically present at Metro Manor once a year. Judge Barbour rejected the Government's position, as does the undersigned, and found that in light of Mason's testimony, the Government had not established a genuine issue of material fact regarding whether Mason had an adequate basis for her belief that Metro Manor was not decent, safe, and sanitary.

that the Government was not, in fact, damaged by defendants' certifications—both of which are relevant only to the Government's claim for damages—it also shows that the challenged certifications were not *material* because in the light of HUD's policies and regular practice, they lacked the tendency or capability to influence HUD's actions. Moreover, the court's conclusion that the evidence of record fails to support an inference that defendants' knowingly made a false statement or claim is premised not directly on what HUD officials knew, but on defendants' own conduct in light of *their* knowledge of HUD's awareness of the conditions of the apartments. Thus, the Government's proof is insufficient to create an issue of fact for trial on the issues of materiality and whether defendants knowingly submitted false statements and/or claims.

*Conclusion:*

In sum, it is the court's considered opinion in this case that the Government has presented no evidence that HUD, either in this case or as a matter of policy and/or practice, is influenced by an owner's HAP certifications as to the condition of property. On the contrary, it is manifest from the evidence that HUD's decisions to pay or not pay HAP vouchers are not substantively informed by an owner's certification, but rather are guided by HUD policy, as well as the practical realities of Section 8 housing programs. Moreover, where HUD chooses in a given case, for policy and/or practical reasons, to make housing assistance payments when it knows full well that the property is not "decent, safe, and sanitary" and that the owner's certification is false, no reasonable argument can be made that the certification was material to HUD's decision to pay. Finally, because the defendants were fully apprised of HUD's awareness of the problems at the apartments which now form the basis of the Government's suit, and in fact, corresponded with HUD with respect to those very same problems, there can simply be no reasonable finding that defendants

"knowingly" made a false statement or claim to HUD regarding the condition of the property. And for all these reasons, the court concludes that the defendants' motion for summary judgment should be granted.

Accordingly, it is ordered that defendants' motion for summary judgment is granted. A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.