EDITH H. JONES, Circuit Judge,
with whom JERRY E. SMITH, RHESA HAWKINS BARKSDALE, DeMOSS and CLEMENT, Circuit Judges, join specially concurring:
I am delighted that the entire court has seen fit to deliver the owners of the Jackson Square Apartments from further exposure to False Claims Act liability. One may readily infer from the majority holding that this is a case that should never have been brought.
Nevertheless, I am uncomfortable with the majority’s rationale that excludes the parties’ dealings from the False Claims Act solely because of HUD’s contract provisions. This contract-based theory was never presented to the district court, was not ruled upon by it, and was never briefed to this court — until counsel were ordered to submit letter briefs less than a week before en banc oral argument. As a matter of prudence and judicial restraint, and under this court’s authorities, we almost never decide cases on issues or theories that were not litigated in the trial court. United States v. Brace, 145 F.3d 247, 255-56 (5th Cir.1998) (en banc) (en banc court declined to consider en banc an issue neither preserved in district court nor presented to appellate panel: “... we review only those issues presented to us; we do not craft new issues or search for them in the record .... In short, it is not for us to decide which issues should be presented, or to otherwise try the case for the parties.”) The court’s majority evidently believe this is such an exceptional case because their analysis affords a “narrower” basis for affirming the summary judgment. To my mind, whether excluding an entire category of HUD contracts and contractual dealings from the False Claims *678 Act[1] is “narrower” than applying well-established defenses under the Act to the facts before us is in the eye of the beholder. But in addition, the broader ramifications of the court’s unprecedented reasoning, which flows from standard contractual provisions of the sort that probably exist throughout the vast breadth of federal government contracting, are uncertain and have been utterly unexplored.
In my view, the preferable “narrow” resolution of this case is based on the issues raised and litigated in the district court concerning whether the owners falsely certified as “decent, safe and sanitary” a low-income apartment project in Jackson, Mississippi in order to obtain HUD subsidies.[2] I would affirm on alternative grounds based on the particular facts of this case. First, the defendants’ monthly certifications, included in their vouchers seeking reimbursement, were not material to HUD’s decision to continue making subsidy payments, and they therefore did not constitute false statements “to get” a false claim paid. 31 U.S.C. § 3729(a)(2) (2000). Second, the defendants did not “knowingljr” submit false claims for reimbursement because the government determined the amount of funds available to maintain the project, the defendants spent every penny of those funds on the project, and the government knew the project’s essential condition. 31 U.S.C. § 3729(b) (2000). The government got exactly what it was willing to pay for.
Judge Reavley’s opinion adequately states the facts.
The False Claims Act imposes liability on “[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; [or] knowingly makes ... a false ... statement to get a false or fraudulent claim paid or approved by the Government.” 31 U.S.C. § 3729(a)(1) and (2) (2000). The statute, which dates from the Civil War era with even older antecedents, was originally passed to prevent “all types of fraud” against the United States government that might result in financial loss. United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968). The issues raised by the parties in this en banc court are the same as those pressed by the owners in the district court: whether their monthly certifications that the project was decent, safe and sanitary were material to HUD’s decision to keep subsidizing it; and whether the owners knowingly filed false claims.
We review the district court’s grant of summary judgment de novo, applying the same standard as the district court. Boston Old Colony Ins. Co. v. Tiner Assocs., 288 F.3d 222, 227 (5th Cir.2002). “Summary judgment is proper only ‘if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.’ ” Turner v. Houma Mun. Fire & Police Civ. Serv. Bd., 229 F.3d 478, 482 (5th Cir.2000) (quoting Fed. R.CivJP. 56(c)).

*679
A. The payment vouchers were not material to HUD’s decision making.

Because the panel opinion has been vacated by the order for rehearing en banc, there should no longer be any doubt that materiality is an element of a civil False Claims Act case. Our past precedent and every circuit that has addressed the issue have so concluded.[3] This conclusion is strengthened in a case involving allegedly false certifications contained in official payment vouchers, because, for FCA liability to arise, a false certification must be a “false statement” made “to get” a false claim paid. See SI U.S.C. § 3729(a)(2) (2000). The express connection of a false statement with “getting” a false claim paid is tantamount to requiring that the false statement be material to the payment decision.
The government is willing to concede, as it did not previously in this litigation, that materiality is an element of its cause of action upon which it carries the burden of proof. The government asserts, however, that whenever it conditions payment for services rendered upon a certification of certain conditions by the payee, a false certification constitutes a material false statement as a matter of law and renders the entire claim actionably false.[4] This position is overbroad and unsupported by relevant law.
The accepted definition of materiality for civil FCA claims, as for other federal statutes, equates materiality with “halving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed.” Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988). The Supreme Court adopted this “more general formulation” of materiality, “because the judgment in question [i.e. of materiality] does not lend itself to mechanical resolution.” Id. at 771, 108 S.Ct. at 1546. Applying this test of materiality, three Justices found Kungys’s misstatements of his date and place of birth on his naturalization application not material because those statements were neither relevant to citizenship qualifications nor, if correctly reported, would they have led to other facts relevant to qualifications for citizenship. Three other members of the Court applied an even stricter standard of materiality. As Kungys demonstrates, the determination of materiality is context-specific and sensitive to what the government accomplishes by means of requiring disclosure of certain information.
Pursuant to Kungys, many certifications made in order to receive government pay- *680 merits may be material to the government’s decision to pay, but such is not invariably the case. In Thompson, this court reflected that reality when it stated that, to create liability under the FCA, a false certification of compliance must be a “prerequisite” to obtaining a government benefit. Thompson, 125 F.3d at 902. Where the facts demonstrate that an agency, though formally requiring a certification, did not condition payment on its veracity, and indeed, the responsible government officials did not even see or review the certification in question, then the certification is not material, and the certified statement will not give rise to FCA liability. See, e.g., United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir.1996) (certification of assurances that school district would comply with applicable federal law not a “prerequisite,” under facts of that case, to receipt of federal IDEA funds). Further, were a court to hold that any kind of government certification required in connection with federal government payment and reimbursement vouchers is material as a matter of law, the government could erase the crucial distinction between “punitive” FCA liability[5] and ordinary breaches of contract by the simple expedient of requiring broad, boilerplate certifications.
The circumstances of this case demonstrate as a matter of law that the owners’ monthly certifications on their HAP vouchers that the project was “decent, safe and sanitary” were not material to HUD’s decisions to continue paying subsidies.
First, although it is clear that HUD was aware of the basic condition of the project, HUD never informed the owners that their project failed to meet the decent, safe and sanitary contractual standard. HUD did not utilize the contractual procedure whereby HUD was required to inform the owners of their noncompliance and to impose a suitable corrective action plan upon them. Only if the owners failed to comply, after notice, could HUD, as one of its possible remedies, contractually elect to discontinue housing assistance payments. The fact that HUD never invoked any remedy against the owners and continued making the payments throughout the period covered by this lawsuit demonstrates the immateriality of the owners’ monthly certifications to payment of the vouchers.
Second, it was HUD’s “normal practice, in keeping with the parties’ respective rights and obligations under the HAP contract, to allow owners to continue to receive subsidies while the owners worked to correct deficiencies that HUD [had] identified. Indeed, it is evident from the proof that HUD [made] housing assistance payments with the expectation that the owner/recipients [would] use those payments to bring their property up to standard.” United States v. Southland Mgmt. Corp., 95 F.Supp.2d 629, 637-38 (S.D.Miss.2000). The government acknowledged in the district court that HUD often elects to continue payments for a particular property despite knowledge that the property, contrary to the owners’ HAP voucher certification, does not meet HUD’s decent, safe and sanitary standard, since the alternative — discontinuance of payments — may work to the detriment of tenants. HUD’s project manager Vicki Gross testified that she never stopped payments, on any of the fifty-four projects for which she was responsible, because of noncompliance with *681 the decent, safe and sanitary standard. Since HUD routinely made Section 8 housing assistance payments to owners of property irrespective of their compliance with the decent, safe and sanitary standard, the owners’ certifications were not material to HUD’s decision to pay.
Third, it is undisputed that all of the money received by the owners in rent payments and HUD subsidies was applied to the mortgage and/or the upkeep of the project from 1998 onward. Since HUD policies governed both the amount of rent charged to the tenants and the amount of monthly subsidies, HUD determined the ultimate quality of the project. In this case — where there is no evidence of the owners’ misapplication of funds or mismanagement — if the project was not decent, safe and sanitary, HUD’s control of the pursestrings led to that result. The owners were not required to invest their capital in the project. Christopher Vill., Ltd. P’ship v. Retsinas, 190 F.3d 310 316 (5th Cir.1999). Consequently, HUD’s funding actions determined whether the owners’ certifications were material.
Fourth, the government points to no evidence supporting its materiality position except the deposition of Quinton Lewis, a HUD employee responsible for reviewing and approving the defendants’ and hundreds of other payment vouchers each month. Lewis, however, testified only that he would not have approved the vouchers if the certifications had not been signed by the defendants or their agents. Lewis also testified that he had not read the certification in any depth and had never heard of the phrase “decent, safe and sanitary” until the date of his deposition. As the district court observed, “there is nothing in the record to show that Lewis, or anyone else with HUD, took into account the actual substance of the certifications in deciding whether to approve the vouchers.” Southland Mgmt. Corp., 95 F.Supp.2d .at 638-39. Instead, HUD’s policy decisions concerning the project were made by Ms. Gross and her superiors based on direct dealings with the owners and regular inspection reports.[6]
For all these reasons, the district court correctly concluded that HUD’s decision to pay the owners’ monthly HAP vouchers “was not linked to their certification as to the condition of the apartments.” South-land Mgmt. Corp., 95 F.Supp.2d at 637.

B. The defendants did not “knowingly” present false claims for payment.

A defendant may be liable for a civil false claim by “knowingly” presenting such a claim, 31 U.S.C. § 3729(a)(1), but specific intent to defraud is not required. 31 U.S.C. § 3729(b) (2000). On the other hand, the statute’s definition of “knowingly” excludes liability for innocent mistakes or negligence. United States ex rel. Hochman v. Nachman, 145 F.3d 1069, 1074 (9th Cir.1998); Rindo v. University of Health Sciences, 65 F.3d 608, 613-14 (7th Cir.1995).[7] The circuits have thus rejected the *682 proposition that claimants “knowingly” presented false claims where there were instances of “mere” contractual or regulatory noncompliance:
... [T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them.
United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir.1999). Innocently made faulty calculations or flawed reasoning cannot give rise to liability. United States ex rel. Wang v. FMC Corp., 975 F.2d 1412, 1420-21 (9th Cir.1992). Further, where disputed legal issues arise from vague provisions or regulations, a contractor’s decision to take advantage of a position can not result in his filing a “knowingly” false claim. See United States ex rel. Siewick v. Jamieson Sci. & Eng’g, Inc., 214 F.3d 1372, 1378 (D.C.Cir.2000); Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478-79 (9th Cir.1996).
Most of our sister circuits have held that under some circumstances, the government’s knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act “knowingly”, because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway. “If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.” United States ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir.1999). The inaptly-named “government knowledge defense” captures the understanding that the FCA reaches only the “knowing presentation of what is known to be false.”[8] Hagood, 81 F.3d at 1478 (citation and internal quotation marks omitted). Where the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises. United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 288-89 (4th Cir.2002); Lamers, 168 F.3d at 1019-1020; United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir.1995). The government’s knowledge and acquiescence in its contractor’s actions in many of these cases was “highly relevant,” see United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir.1991), to show that the contractor did not submit payment claims in deliberate ignorance or reckless disregard of their truth or falsity.[9]
*683 The conclusion that these owners did not knowingly present false claims fits easily within the established caselaw. The district court’s opinion is persuasive:
On this issue, the evidence positively demonstrates beyond reasonable question that at the time of defendants’ submission of the challenged vouchers and HTJD’ s approval of those vouchers, HUD, based on its own annual inspections of the property, knew full well of the very conditions of the property which it now claims made the property not “decent, safe, and sanitary.” HUD, through its contract inspector, Management Solutions of America, Inc., conducted annual inspections of the Jackson Apartments for each of the years defendants’ HAP Contract was in effect; and for each of the years from August 1993 to May 1997, based on conditions found to exist at the property by HUD’s inspector, the apartments received “below average” or “unsatisfactory” physical inspection reports from HUD. HUD’s inspector furnished to HUD’s project manager responsible for the apartments a copy of his inspection report in which he detailed his specific findings and indicated repairs which needed to be made in order that the property would satisfy HUD’s minimum housing quality standards. Vicki Gross, the project manager for the time period at issue, in turn, furnished the inspection report to her superiors who, in turn, forwarded the inspection reports to defendants or their managing agent, and advised defendants and/or their agent of those repairs which were required to be made and requested that defendants and/or their agent inform HUD of the actions that would be taken, along with a timetable, to correct the deficiencies which HUD had identified. At her deposition, Vicki Gross, who testified as HUD’s representative, explained that properties receiving “below average” and “unsatisfactory” physical condition ratings in inspection reports are not “decent, safe, and sanitary.” And indeed, the conditions upon which the Government makes its affirmative allegation that the Jackson Apartments were not in a “decent, safe, and sanitary” condition are those same specific deficiencies which HUD’s inspector identified and which led him to assign the apartments the “below average” and “unsatisfactory” ratings. From this evidence, there can be no question but that HUD was fully aware of the conditions of the apartments, and specifically, of those deficiencies which it asserts made the apartments not “decent, safe, and sanitary.” And yet HUD, which was aware that defendants continued to submit HAP vouchers and receive payments throughout this time, allowed those payments to continue.
Southland Mgmt. Corp., 95 F.Supp.2d at 639-40 (emphasis added).
HUD was aware that this project was deteriorating for several years preceding its foreclosure. The types of problems emphasized by the government as creating substandard living conditions were not hidden defects. Photographs of the property taken by the mortgagee inspectors are in the record, and HUD reviewed those inspection reports. The yearly inspection reports also show that repairs were being made regularly, and HUD knew this, as it also knew that its subsidies were insufficient to allay the deterioration. The record reflects at most the give and take between the owners and HUD over the priority of various repairs, but it does not cast doubt on the owners’ investment of every penny of subsidy in the project. As the district court noted, HUD’s policy of *684 approving continued subsidy payments notwithstanding the project’s declining condition was based not on its ignorance of the true condition but upon the imperative to provide housing for the tenants while HUD supervised the use of the limited funds it allocated to the project.
Further relevant to whether the owners knowingly presented false claims are the facts that HUD never informed the owners that their project was not decent, safe and sanitary and never invoked the contractual remedies for noncompliance with that standard. No regulatory or contractual definition of that standard exists. The content of the standard is far from self-evident. HUD, for its part, did not even place the project on its list of troubled properties until nine months after the period for which FCA damages are now sought. At oral argument to the en banc court, the government’s attorney repeatedly failed to offer any coherent, non-tautological definition of the standard. Where there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant’s actions are in good faith, the claimant cannot be said to have knowingly presented a false claim. Lamers, 168 F.3d at 1018 (“imprecise statements or differences in interpretation growing out of a disputed legal question are ... not false under the FCA”) (citation omitted).
The government suggests that even if HUD knew something about the project’s condition, the owners, who visited regularly, knew more about their noncompliance with the decent, safe and sanitary standard. This is wholly unpersuasive. The district court correctly parried this contention by pointing out that HUD now relies on exactly the deficiencies stated in its annual inspection reports to condemn the owners’ certifications of compliance with the standard.[10] Whatever HUD’s precise knowledge about the property, the government deemed it sufficient to threaten and then file this civil FCA case.
The civil False Claims Act is essential to policing the integrity of the government’s dealings with those to whom it pays money. At the same time, the punitive treble damages and penalties afforded by civil FCA actions are not interchangeable with remedies for ordinary breaches of contract. In this case, even if the owners may have breached their contract to provide decent, safe and sanitary housing for low-income tenants, they did not knowingly present false statements to get false claims paid, and their allegedly false certifications were, under the circumstances of this case, not material to HUD’s ongoing decision to subsidize the project.
For these reasons, the summary judgment for the owners was proper.

. The parties’ contract is a HUD standard form for Section 8 projects. Further, as noted infra, deposition testimony established that HUD practically never invoked contract remedies against project owners, no matter how "troubled” their properties were. HUD apparently will be barred by the court’s decision from pursuing FCA claims, at least for inarguable violations of the decent, safe and sanitary standard, where such contracts exist.

. The grant of en banc rehearing vacated the panel decision, so it is unnecessary to discuss that opinion further.

. This court recently reaffirmed that the civil FCA “interdicts material misrepresentations made to qualify for government privileges or services." United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir.1997) (emphasis added) (quoting United States ex rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 461 (5th Cir.1977)). Other circuits hold that materiality is required in a civil FCA claim. See, e.g., United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883 (8th Cir.2003); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785, 788 (4th Cir.1999); Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 732 (7th Cir.1999); United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C.Cir.1994). A recent district court decision, after conducting the most extensive survey to date of the history, legislative background and caselaw interpreting the FCA, concluded that materiality is an element of a civil FCA claim. See United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F.Supp.2d 601, 618-30 (S.D.Tex.2001).

. Indeed, while the government asserts that its suit is interchangeably brought under either section 3729(a)(1) or (a)(2), proscribing, respectively, false claims and false statements, the government deems the owners’ "claims” to be false only because of the false certifications.

. Civil FCA actions for treble actions and penalties are “punitive.” Vermont Agency of Natural Res. v. United States ex rel. Stephens, 529 U.S. 765, 784-85, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 244 F.3d 486, 491 and n. 5 (5th Cir.2001), cert. denied, 534 U.S. 1078, 122 S.Ct. 808, 151 L.Ed.2d 693 (2002).

. If the evidence suggested that the approving government official took the truth or falsity of the defendants’ certifications into account in deciding whether to pay the vouchers, this might be a different case. See Thompson, 125 F.3d at 902-03 (in the context of Medicare certifications, this court was "unable to determine from the record before us whether, or to what extent, payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compli-anee,” and the court remanded this issue to the district court for further factual development).

. Knowing and knowingly defined. For purposes of [section 3729], the terms “knowing” and "knowingly" mean that a person, with respect to information—
(1) has actual knowledge of the information;
*682 (2) acts in deliberate ignorance of the truth or falsity of the information; or
(3) acts in reckless disregard of the truth or falsity of the information,
and no proof of specific intent to defraud is required.
31 U.S.C. § 3729(b) (2000).

. This defense is inaptly named because it is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the "knowing” presentation of a false claim. Inevitably, the extent of the government's knowledge is also bound up with whether the claim itself was false. See Lamers, 168 F.3d at 1018.

. Courts have qualified the importance of government knowledge by stating that it may not always provide a conclusive defense to the claimant. No case has squarely interpreted this qualification, nor need we do so. In principle, it would seem that the government’s knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false; if the claimant was colluding with the government employee to submit a false claim; or if the govern- *683 merit's knowledge came "too late in the process,” see Durcholz, 189 F.3d at 544-45.

. Indeed, the United States Attorney threatened in March 1996 to sue the owners for FCA penalties based on their false certifications, but HUD subsidies continued until the property was foreclosed in July 1998. And after that, HUD had the owners manage the apartments for another three months.