**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 1, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 00-60267

———————————————

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

                    versus

SOUTHLAND MANAGEMENT CORP., ET AL.,

                                        Defendants,

W. THAD McLAURIN, CHARLES C. TAYLOR, JR.,
and ARTHUR W. DOTY,

                                        Defendants-Appellees.

————————————————————————————————

Appeal from the United States District Court for
the Southern District of Mississippi

————————————————————————————————

Before KING, Chief Judge, and REAVLEY, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS and CLEMENT, Circuit Judges.

REAVLEY, Circuit Judge:

The United States seeks False Claims Act[1] penalties from the owners of an apartment project for falsely certifying that the property was decent, safe, and sanitary in requesting supplemental rent payments funded under Section 8 of the United States

_____

[1]      31 U.S.C. § 3729 (2003).

Housing Act.[2]  The district court granted summary judgment for the owners,[3] and a panel of this court remanded for trial.[4]  Those decisions addressed the materiality of the allegedly false certifications and the issue whether the owners knowingly submitted false claims.  We do not reach those questions because we hold that, on this record, no false claims were made.  We therefore affirm the judgment for the owners.

## BACKGROUND

The National Housing Act of 1934[5] was enacted to encourage private industry to provide housing for low-income families.[6]  It authorizes the U.S. Department of Housing and Urban Development ("HUD") to guarantee private mortgage loans to construct new housing and rehabilitate old structures for "families with incomes so low that they could not otherwise decently house themselves."[7]  Private property owners receiving the nonrecourse mortgages must enter into a "regulatory agreement" with HUD which specifies "rents, charges, and other methods of operation, in such form and in such manner as in the opinion of the Secretary [of HUD] will effectuate the purposes of this section . . . ."[8]  In 1937, the United States Housing Act[9] was enacted to provide housing

---

[2]      42 U.S.C. § 1437f(a) (Supp. 2003).

[3]      95 F. Supp. 2d 629 (S.D. Miss. 2000).

[4]      288 F.3d 665 (5th Cir.), vacated on reh'g en banc, 307 F.3d 352 (5th Cir. 2002).

[5]      Pub. L. No. 73-479, 48 Stat. 1246 (codified as amended in scattered sections of 12 U.S.C. §§ 1701-1750g (2001 & Supp. 2003).

[6]      12 U.S.C. § 1715*l* (2001).

[7]      12 U.S.C. §§ 1703, 1701t (2001).

[8]      12 U.S.C. § 1715*l*(d)(3) (2001).

[9]      Pub. L. No. 75-412, 50 Stat. 889 (codified as amended at 42 U.S.C. § 1437 et seq. (2000 & Supp. 2003)).

by making payments directly to local housing authorities. Section 8 was added to this Act in 1974 to authorize the making of "assistance payments" to encourage private property owners to provide housing.[10] The amount of these assistance payments (made directly to the private property owners in the form of a subsidy) is determined by what the tenants can afford to pay, and what the private property owner could otherwise expect to charge under the prevailing market rates.[11] To receive assistance payments the property owner must enter into a housing assistance payment contract ("HAP Contract").[12]

In 1980, Defendants-Appellees W. Thad McLaurin, Charles C. Taylor Jr., and Arthur W. Doty ("the Owners") executed an agreement called the "Regulatory Agreement for Insured Multi-Family Housing Projects (With Section 8 Housing Assistance Payment Contracts)" ("the Regulatory Agreement"). Under this agreement, HUD promised to guarantee the Owners' obligation under the mortgage used to purchase an abandoned apartment complex--the Jackson Apartments--and also to subsidize tenants' rent payments in accordance with a subsequently-executed HAP Contract. The Owners, in turn, agreed to substantially rehabilitate the property and to keep it "in good repair and condition." The property was rehabilitated using the proceeds of a $2.4 million nonrecourse mortgage loan guaranteed by the United States. The Owners invested $190,000 of their own funds in the project.

Under the HAP Contract, the Owners agreed to "maintain the [property] . . . to

---

[10]     Pub. L. No. 93-383, 88 Stat. 662 (codified as amended at 42 U.S.C. § 1437(f) (Supp. 2003)).

[11]     42 U.S.C. §§ 1437a(a)(1), 1437f(c) (Supp. 2003).

[12]     12 U.S.C. § 1437f(c) (2000 & Supp. 2002); 24 C.F.R. § 811.102 (2002).

3

provide Decent, Safe, and Sanitary housing." The contract also required that the Owners make monthly requests for housing assistance payments. In each request--called a "HAP voucher"--the Owners were required to give the details of occupied apartments and the supplemental rental payments due, and certify that "to the best of [their] knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, [and] (ii) all other facts and dates on which the request for funds is based are true and correct . . . ."

Both the Regulatory Agreement and the HAP Contract explained HUD's remedies if the Owners failed to comply with the contracts' terms. The Regulatory Agreement stated that upon violation of any of its parts HUD may give written notice of such violation. If the Owners failed to take corrective action, HUD was authorized to declare a default, and, among other things, to request that the mortgagee bank declare the Owners' note due and foreclose on the property. The HAP Contract required that HUD inspect the property at least once a year to see that the Owners were maintaining the units in decent, safe, and sanitary condition. In the event that HUD notified the Owners in writing that the property was not in decent, safe, and sanitary condition, and the Owners thereafter failed to take corrective action within the time prescribed in the notice, HUD was authorized to exercise any of its rights and remedies under the contract, including the abatement of housing assistance payments.

From 1981 until 1997 the Owners submitted HAP vouchers in accordance with the HAP Contract and HUD paid the vouchers. Up until 1993 the record does not indicate that the property ever failed to pass HUD's yearly inspections. But by 1993 the property was deteriorating and had become the center of criminal activity. In August 1993 the property received a "below average" rating during HUD's yearly inspection. The report stated that repair and maintenance in many areas was urgently needed, and noted that the

4

property, like many in its area, was experiencing a problem with illegal drug activity. HUD's letter advising the Owners of the results of this inspection requested that the Owners respond in writing to the deficiencies noted and include a detailed explanation of their planned corrective measures.

In August 1994 HUD undertook both a management review and a physical inspection. The management received a "satisfactory" rating and the report stated that "[m]anagement is to be commended for the steps taken and planned to provide a more secure environment for the residents." However, as a result of the physical inspection, HUD gave the property a "below average" rating. The report stated that many of the deficiencies noted in 1993 had not been corrected. Of the 18 units inspected, all but two needed immediate repairs, although each unit was deemed passable under HUD's "Housing Quality Standards."[13] The report detailed numerous corrective actions required and, for each, listed an estimated cost and time frame for correction. Several months later HUD wrote, "It is understood that funds are not readily available for repairs," but asked that the Owners be mindful of the safety of tenants and workers and that "hazardous" deficiencies be addressed as soon as possible.

After 1994, the Owners devoted all rental income and subsidies to mortgage payments and property maintenance and repairs. They took no further distributions for return on their investment in the property.

In 1995 the property was rated "below average" for the third time, and all of the inspected units failed to meet HUD's Housing Quality Standards. Again, corrective

---

[13]     As the district court noted, during the time period at issue, the Housing Quality Standards to which HUD referred did not apply to the particular Section 8 program covering the Owners' property, but they were apparently used by HUD as a guideline for measuring the condition of the property.

action was prescribed with an estimated cost and time frame for each. Many of the deficiencies were the same as those in 1993 and 1994. The report warned that if the property was not brought into compliance within 30 days further subsidy payments "may be jeopardized." HUD's letter transmitting the report to the Owners warned them that "[t]he Department does not allow management to continue at this level of performance."[14]

In late 1996 HUD gave the property the lowest rating--"unsatisfactory." The report said there were "compelling reasons" for this rating, including the fact that every inspected unit failed to comply with HUD's Housing Quality Standards. The report again cataloged the property's deficiencies and, for each, listed the necessary corrective action along with an estimated cost and time frame. The report also noted, however, that the property staff were "very cooperative throughout the physical inspection." The letter that accompanied this report stated that the property could not continue to operate in its present condition, and that failure to make corrections "could result in the denial of future participation" in HUD-sponsored housing programs. However, in another letter HUD wrote, among other things, "We look forward to working with you in an attempt to bring this property back to satisfactory condition."

HUD's last inspection was in May 1997. For the second time HUD gave the property an "unsatisfactory" rating. HUD again cataloged each of the property's deficiencies and advised the Owners that "[t]he Department does not allow management

---

[14]    In March 1996, the U.S. Attorney began forfeiture proceedings against the property for its role in facilitating illegal drug activity. In a subsequent letter, the U.S. Attorney threatened to bring claims against the Owners individually for violation of the civil False Claims Act, citing the their allegedly "false" monthly certifications that the property was decent, safe, and sanitary. However, he offered to nonsuit--and to bring no further claims--if the Owners agreed to surrender the property to the government's designee. The Owners immediately agreed to do this, but the record does not explain why the U.S. Attorney took no further action--probably because HUD could find no one else to take the property.

to continue at this level of performance." In August 1997, the Owners wrote that they were discontinuing mortgage payments due to lack of funds, and that the property was being turned over to HUD. They offered to manage the property for no charge until control could be transferred. The Owners managed the property without compensation until after the property was auctioned in July 1998.

The United States initiated this proceeding on August 5, 1998. The United States claims that the Owners violated the civil False Claims Act because 19 HAP vouchers they submitted between July 1995 and January 1997 falsely certified that the property was decent, safe, and sanitary.[15] The United States argues that each certification constitutes a "false claim for payment or approval . . . within the meaning of 31 U.S.C. § 3729(a)(1)," and also a "false statement and/or record within the meaning of 31 U.S.C. § 3729(a)(2)." The certifications had been used to secure $865,023 in housing subsides, and because the United States claimed that the certifications were knowingly false when made, it sought treble damages, for a total of about $2.5 million.

## DISCUSSION

The civil False Claims Act, 31 U.S.C. § 3729, in relevant part states:

> **(a) Liability for certain acts.**--Any person who--
>> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
>> **(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . .
>> . . . .
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

---

[15] Southland Management Corp. managed the property and has since been dismissed as a party.

7

. . . .

As the preceding statutory text shows, and as the name of the Act suggests, the Act is aimed at false claims. The statute defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property"[16] which is made to someone--including the government itself--who will at least in part use government money or property to pay it. Stated differently, it is a "request or demand" made in connection with a "contract or otherwise," the "contract or otherwise" allegedly warranting the making of the claim. Thus, whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it. It is only those claims for money or property to which a defendant is not entitled that are "false" for purposes of the False Claims Act. See Costner v. URS Consultants, Inc., 153 F.3d 667, 677 (8th Cir. 1998) ("[O]nly those actions by the claimant . . . [calculated to] caus[e] the United States to pay out money it is not obligated to pay . . . are properly considered 'claims' within the meaning of the FCA."); United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 626 (S.D. Tex. 2001) (collecting authorities for the proposition that a "false claim" is a claim for more than one is due).

In this case unless the Owners submitted claims for money to which they were not entitled no False Claims Act liability arises. Although § 3729(a)(2) prohibits the submission of a false record or statement, it does so only when the submission of the record or statement was done in an attempt to get a false claim paid. There is no liability under this Act for a false statement unless it is used to get false claim paid.[17]

---

[16]     31 U.S.C. § 3729(c).

[17]     See Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001) (stating that the FCA "was not intended to impose liability for every false statement made to the government").

8

When we apply this law to the HAP Contract and the course of conduct between HUD and the Owners, we conclude upon this record that the Owners were entitled to the housing assistance payments sought and, thus, they made no false claims.

### The Contract

"Decent, safe, and sanitary" is a meaningful and useful description of homes and apartment houses, but it is not precise or measurable. There will be wide difference of opinion of what is, and what is not, decent, safe, or sanitary. Just look at the current attire of people in our society to see the variations in notions of decency. Consider the plight of an owner who could be subject to False Claims Act liability by certifying that his 120 apartments are decent, safe, and sanitary when on any given day a United States Attorney could decide to the contrary, and perhaps ultimately convince a jury to agree. That owner would be forced to walk away from the property at an early sign of deterioration. If no one else were willing to incur the risk of False Claims Act liability, tenants would lose their housing. That state of affairs would be unacceptable to all parties and wholly inconsistent with federal housing policy.

Furthermore, if enforcement of the condition of the property were left to False Claims Act sanctions, consider the burden of the U.S. Attorney who must prove that the owner has knowingly certified falsely. It would not suffice that government employees, or even jurors, describe the property as less than decent. The burden would be to prove the state of mind of the owner: that he knew he could not honestly describe the property as "decent, safe, and sanitary."

Fortunately for everyone, these problems are avoided by the terms of this contract between the Owners and HUD where the mechanism is spelled out for controlling the abatement of the payments, and the entitlement of the Owners, when the condition of the

9

property deteriorates.

Section 1.7 to the HAP contract, in relevant part, provides as follows:

c.      <u>Units Not Decent, Safe, and Sanitary</u>. If the Government notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the Government may exercise any of its rights under the contract, including the abatement of housing assistance payments, even if the Family continues to occupy that unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the Government does not have other section 8 funds for such purposes, the Government may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. Where this is done, the Owner shall be notified that he will be entitled to resumption of housing assistance payments for the vacated units if (1) the unit is restored to Decent, Safe, and Sanitary condition, (2) the Family is willing to and does move back into the restored unit, and (3) a deduction is made for the expenses incurred by the Family for both moves.

d.      <u>Notification of Abatement</u>. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.

Thus, according to the HAP Contract, if the property is not decent, safe, and sanitary and HUD chooses to work with the Owners to remedy the property's condition, the Owners remain entitled to housing assistance payments until HUD provides written notice, prescribes a time for corrective action, and notifies the Owners that they have failed to take the necessary corrective action within the specified time period.[18]

The United States does not contend that an abatement of payment by HUD was

---

[18]      During this corrective action period, the HAP Contract clearly contemplates the continued application for and receipt of housing assistance payments, with no modification to the contractual requirement that the Owners certify in the monthly HAP voucher that the property is decent, safe, and sanitary. In this respect, the HAP Contract is perhaps internally inconsistent, but in view of its provisions, it is at least understandable how the Owners could have continued to use the HAP voucher form with its contractually required certification that the property is decent, safe, and sanitary.

10

ever exercised. The central position of the United States in this litigation has been that the claims for housing assistance payments submitted by the Owners during the period covered by the complaint, July 1995 through January 1997, were false claims, i.e., claims for payments to which the Owners were not entitled, because during this period the Owners were in breach of their obligation under the HAP Contract to provide decent, safe, and sanitary housing. What this ignores is that the HAP Contract explicitly addresses a breach of this nature and provides a specific remedy: when the Owners are notified by HUD that they have failed to maintain the property in decent, safe, and sanitary condition and that corrective action must be taken within the time specified in the notice, the Owners continue to be entitled to receive housing assistance payments during the corrective action period and until HUD notifies them in writing that they have failed to take the necessary corrective action and that housing assistance payments will be abated. During the corrective action period, then, claims for housing assistance payments are not false claims because they are claims for money to which the Owners are entitled (and which provide the wherewithal both to operate the property and to take the necessary corrective actions).

Course of Conduct

The exchanges and conduct of the parties demonstrated that housing assistance payments continued in an effort to keep the apartments habitable and to provide the means to take the corrective action requested by HUD. During the period of time covered by the complaint, July 1995 through January 1997, there was significant evidence that the property was increasingly uninhabitable, and that HUD had concluded that the property had fallen below the decent, safe, and sanitary standard. At the same time, HUD was willing to work with the Owners to continue with their efforts to bring the property back

11

into compliance. Moreover, HUD seemed to recognize that the property's noncompliance was at least partially explained by a lack of funds and nearby criminal activity. In 1995, perhaps recognizing the lack of funds for routine maintenance and repairs, HUD asked the Owners to at least address "hazardous" deficiencies that presented a danger to the safety of tenants and workers. In 1996, following the property's receipt of its lowest rating to date, HUD wrote that it was "look[ing] forward to working with you in an attempt to bring this property back to satisfactory condition."

The undisputed conduct and exchanges by and between the parties during this entire period demonstrates, not only that the vouchers were promptly paid, but that all parties regarded them as entitled to be paid.

## CONCLUSION

We hold that under the HAP Contract and on this record the Owners were entitled to receive the housing assistance payments that they sought during the corrective action period at issue. Their claims therefore cannot be false under the False Claims Act as a matter of law. The judgment of the district court is AFFIRMED.

EDITH H. JONES, with whom SMITH, BARKSDALE, DeMOSS and CLEMENT, Circuit Judges, join in specially concurring:

I am delighted that the entire court has seen fit to deliver the owners of the Jackson Square Apartments from further exposure to False Claims Act liability. One may readily infer from the majority holding that this is a case that should never have been brought.

Nevertheless, I am uncomfortable with the majority's rationale that excludes the parties' dealings from the False Claims Act solely because of HUD's contract provisions. This contract-based theory was never presented to the district court, was not ruled upon by it, and was never briefed to this court – until counsel were ordered to submit letter briefs less than a week before en banc oral argument. As a matter of prudence and judicial restraint, and under this court's authorities, we almost never decide cases on issues or theories that were not litigated in the trial court. United States v. Brace, 145 F.3d 247, 255-56 (5th Cir. 1998) (en banc) (en banc court declines to consider en banc an issue neither preserved in district court nor presented to appellate panel: ". . . we review only those issues presented to us; we do not craft new issues or search for them in the record. . . . In short, it is not for us to decide which issues should be presented, or to otherwise try the case for the parties.") The court's majority evidently believe this is such an exceptional case because their analysis affords a "narrower" basis for affirming the summary judgment. To my mind, whether excluding an entire category

13

of HUD contracts and contractual dealings from the False Claims Act[1] is "narrower" than applying well-established defenses under the Act to the facts before us is in the eye of the beholder. But in addition, the broader ramifications of the court's unprecedented reasoning, which flows from standard contractual provisions of the sort that probably exist throughout the vast breadth of federal government contracting, are uncertain and have been utterly unexplored.

In my view, the preferable "narrow" resolution of this case is based on the issues raised and litigated in the district court concerning whether the owners falsely certified as "decent, safe and sanitary" a low-income apartment project in Jackson, Mississippi in order to obtain HUD subsidies.[2] I would affirm on alternative grounds based on the particular facts of this case. First, the defendants' monthly certifications, included in their vouchers seeking reimbursement, were not material to HUD's decision to continue making subsidy payments, and they therefore did not constitute false statements "to get" a false claim paid. 31 U.S.C. § 3729(a)(2) (2000). Second, the defendants did not "knowingly" submit false claims for reimbursement because the government

---

[1]The parties' contract is a HUD standard form for Section 8 projects. Further, as noted infra, deposition testimony established that HUD practically never invoked contract remedies against project owners, no matter how "troubled" their properties were. HUD apparently will be barred by the court's decision from pursuing FCA claims, at least for inarguable violations of the decent, safe and sanitary standard, where such contracts exist.

[2]The grant of en banc rehearing vacated the panel decision, so it is unnecessary to discuss that opinion further.

14

determined the amount of funds available to maintain the project, the defendants spent every penny of those funds on the project, and the government knew the project's essential condition.  31 U.S.C. § 3729(b) (2000).  The government got exactly what it was willing to pay for.

Judge Reavley's opinion adequately states the facts.

The False Claims Act imposes liability on "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] knowingly makes . . . a false . . . statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(1) and (2) (2000).  The statute, which dates from the Civil War era with even older antecedents, was originally passed to prevent "all types of fraud" against the United States government that might result in financial loss.  United States v. Neifert White Co., 390 U.S. 228, 232, 88 S. Ct. 959, 961 (1968).  The issues raised by the parties in this en banc court are the same as those pressed by the owners in the district court: whether their monthly certifications that the project was decent, safe and sanitary were material to HUD's decision to keep subsidizing it; and whether the owners knowingly filed false claims.

We review the district court's grant of summary judgment de novo, applying the same standard as the district court.  Boston Old Colony Ins. Co. v. Tiner Assocs., 288 F.3d 222, 227 (5th Cir.

15

2002).  "Summary judgment is proper only 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.'" Turner v. Houma Mun. Fire & Police Civ. Serv. Bd., 229 F.3d 478, 482 (5th Cir. 2000) (quoting Fed. R. Civ. P. 56(c)).

## A. The payment vouchers were not material to HUD's decision making.

Because the panel opinion has been vacated by the order for rehearing en banc, there should no longer be any doubt that materiality is an element of a civil False Claims Act case.  Our past precedent and every circuit that has addressed the issue have so concluded.[3]  This conclusion is strengthened in a case involving allegedly false certifications contained in official payment vouchers, because, for FCA liability to arise, a false certification must be a "false statement" made "to get" a false claim paid.  See 31 U.S.C. § 3729(a)(2) (2000).  The express connection of a false statement with "getting" a false claim paid

---

[3]This court recently reaffirmed that the civil FCA "interdicts material misrepresentations made to qualify for government privileges or services." United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp, 125 F.3d 899, 902 (5th Cir. 1997) (emphasis added) (quoting United States ex. rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 461 (5th Cir. 1977)).  Other circuits hold that materiality is required in a civil FCA claim.  See, e.g., United States ex. rel. Costner v. URS Consultants, Inc., ____ F.3d _____, 2003 WL 173965 (8th Cir. Jan. 28, 2003); Harrison v. Westinghouse Savannah River Company, 176 F.3d 776, 785, 788 (4th Cir. 1999); Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 732 (7th Cir. 1999); United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C. Cir. 1994).  A recent district court decision, after conducting the most extensive survey to date of the history, legislative background and caselaw interpreting the FCA, concluded that materiality is an element of a civil FCA claim.  See United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 618-30 (S.D. Tex. 2001).

16

is tantamount to requiring that the false statement be material to the payment decision.

The government is willing to concede, as it did not previously in this litigation, that materiality is an element of its cause of action upon which it carries the burden of proof. The government asserts, however, that whenever it conditions payment for services rendered upon a certification of certain conditions by the payee, a false certification constitutes a material false statement as a matter of law and renders the entire claim actionably false.[4] This position is overbroad and unsupported by relevant law.

The accepted definition of materiality for civil FCA claims, as for other federal statutes, equates materiality with "ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770, 108 S. Ct. 1537, 1546 (1988). The Supreme Court adopted this "more general formulation" of materiality, "because the judgment in question [i.e. of materiality] does not lend itself to mechanical resolution." Id. at 771, 108 S. Ct. at 1546. Applying this test of materiality, three Justices found Kungys's misstatements of his date and place of birth on his naturalization application not material because those statements were neither relevant to

_____

[4]Indeed, while the government asserts that its suit is interchangeably brought under either section 3729(a)(1) or (a)(2), proscribing, respectively, false claims and false statements, the government deems the owners' "claims" to be false only because of the false certifications.

17

citizenship qualifications nor, if correctly reported, would they have led to other facts relevant to qualifications for citizenship. Three other members of the Court applied an even stricter standard of materiality. As Kungys demonstrates, the determination of materiality is context-specific and sensitive to what the government accomplishes by means of requiring disclosure of certain information.

Pursuant to Kungys, many certifications made in order to receive government payments may be material to the government's decision to pay, but such is not invariably the case. In Thompson, this court reflected that reality when it stated that, to create liability under the FCA, a false certification of compliance must be a "prerequisite" to obtaining a government benefit. Thompson, 125 F.3d at 902. Where the facts demonstrate that an agency, though formally requiring a certification, did not condition payment on its veracity, and indeed, the responsible government officials did not even see or review the certification in question, then the certification is not material, and the certified statement will not give rise to FCA liability. See, e.g., United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996) (certification of assurances that school district would comply with applicable federal law not a "prerequisite," under facts of that case, to receipt of federal IDEA funds). Further, were a court to hold that any kind of government certification required in connection with federal government payment and reimbursement

18

vouchers is material as a matter of law, the government could erase the crucial distinction between "punitive" FCA liability[5] and ordinary breaches of contract by the simple expedient of requiring broad, boilerplate certifications.

The circumstances of this case demonstrate as a matter of law that the owners' monthly certifications on their HAP vouchers that the project was "decent, safe and sanitary" were not material to HUD's decisions to continue paying subsidies.

First, although it is clear that HUD was aware of the basic condition of the project, HUD never informed the owners that their project failed to meet the decent, safe and sanitary contractual standard. HUD did not utilize the contractual procedure whereby HUD was required to inform the owners of their noncompliance and to impose a suitable corrective action plan upon them. Only if the owners failed to comply, after notice, could HUD, as one of its possible remedies, contractually elect to discontinue housing assistance payments. The fact that HUD never invoked any remedy against the owners and continued making the payments throughout the period covered by this lawsuit demonstrates the immateriality of the owners' monthly certifications to payment of the vouchers.

Second, it was HUD's "normal practice, in keeping with

_____

[5]Civil FCA actions for treble actions and penalties are "punitive." Vermont Agency of Natural Res. v. United States ex rel. Stephens, 529 U.S. 765, 784-85, 120 S. Ct. 1858 (2000); United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 244 F.3d 486, 491 and n.5 (5th Cir. 2001), cert. denied, 534 U.S. 1078 (2002).

the parties' respective rights and obligations under the HAP contract, to allow owners to continue to receive subsidies while the owners worked to correct deficiencies that HUD [had] identified. Indeed, it is evident from the proof that HUD [made] housing assistance payments with the expectation that the owner/recipients [would] use those payments to bring their property up to standard." United States v. Southland Mgmt. Corp., 95 F. Supp. 2d 629, 637-38 (S.D. Miss. 2000). The government acknowledged in the district court that HUD often elects to continue payments for a particular property despite knowledge that the property, contrary to the owners' HAP voucher certification, does not meet HUD's decent, safe and sanitary standard, since the alternative – discontinuance of payments – may work to the detriment of tenants. HUD's project manager Vicki Gross testified that she never stopped payments, on any of the fifty-four projects for which she was responsible, because of noncompliance with the decent, safe and sanitary standard. Since HUD routinely made Section 8 housing assistance payments to owners of property irrespective of their compliance with the decent, safe and sanitary standard, the owners' certifications were not material to HUD's decision to pay.

Third, it is undisputed that all of the money received by the owners in rent payments and HUD subsidies was applied to the mortgage and/or the upkeep of the project from 1993 onward. Since HUD policies governed both the amount of rent charged to the

20

tenants and the amount of monthly subsidies, HUD determined the ultimate quality of the project.  In this case – where there is no evidence of the owners' misapplication of funds or mismanagement – if the project was not decent, safe and sanitary, HUD's control of the pursestrings led to that result.  The owners were not required to invest their capital in the project.  <u>Christopher Vill. Ltd. P'ship</u>, 190 F.3d at 316.  Consequently, HUD's funding actions determined whether the owners' certifications were material.

Fourth, the government points to no evidence supporting its materiality position except the deposition of Quinton Lewis, a HUD employee responsible for reviewing and approving the defendants' and hundreds of other payment vouchers each month. Lewis, however, testified only that he would not have approved the vouchers if the certifications had not been <u>signed</u> by the defendants or their agents.  Lewis also testified that he had not read the certification in any depth and had never heard of the phrase "decent, safe and sanitary" until the date of his deposition.  As the district court observed, "there is nothing in the record to show that Lewis, or anyone else with HUD, took into account the actual substance of the certifications in deciding whether to approve the vouchers."  <u>Southland Mgmt. Corp.</u>, 95 F. Supp. 2d at 638-39.  Instead, HUD's policy decisions concerning the project were made by Ms. Gross and her superiors based on direct

21

dealings with the owners and regular inspection reports.[6]

For all these reasons, the district court correctly concluded that HUD's decision to pay the owners' monthly HAP vouchers "was not linked to their certification as to the condition of the apartments." Southland Mgmt. Corp., 95 F. Supp. 2d at 637.

**B.    The defendants did not "knowingly" present false claims for payment.**

A defendant may be liable for a civil false claim by "knowingly" presenting such a claim, 31 U.S.C. § 3729(a)(1), but specific intent to defraud is not required. 31 U.S.C. § 3729(b) (2000). On the other hand, the statute's definition of "knowingly" excludes liability for innocent mistakes or negligence. United States ex rel. Hochman v. Nackman, 145 F.3d 1069, 1074 (9th Cir. 1998); Hindo v. University of Health Sciences, 65 F.3d 608, 613-14 (7th Cir. 1995).[7] The circuits have thus rejected the proposition that claimants "knowingly" presented false claims where there were

---

[6]If the evidence suggested that the approving government official took the truth or falsity of the defendants' certifications into account in deciding whether to pay the vouchers, this might be a different case. See Thompson, 125 F.3d at 902-03 (in the context of Medicare certifications, this court was "unable to determine from the record before us whether, or to what extent, payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compliance," and the court remanded this issue to the district court for further factual development).

[7]Knowing and knowingly defined. For purposes of [section 3729], the terms "knowing" and "knowingly" mean that a person, with respect to information -

(1)    has actual knowledge of the information;
(2)    acts in deliberate ignorance of the truth or falsity of the information; or
(3)    acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (2000).

22

instances of "mere" contractual or regulatory noncompliance:

> . . . [T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them.

United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir. 1999). Innocently made faulty calculations or flawed reasoning cannot give rise to liability. United States ex rel. Wang v. FMC Corp., 975 F.2d 1412, 1420-21 (9th Cir. 1997). Further, where disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position can not result in his filing a "knowingly" false claim. See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1378 (D.C. Cir. 2000); Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478-79 (9th Cir. 1996).

Most of our sister circuits have held that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act "knowingly", because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway. "If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." United States ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999). The inaptly-named "government knowledge defense" captures the understanding that the

23

FCA reaches only the "knowing presentation of what is known to be false."[8]  Hagood, 81 F.3d at 1478 (citation and internal quotation marks omitted).  Where the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises.  United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 288-89 (4th Cir. 2002); Lamers, 168 F.3d at 1019-1020;  United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995).  The government's knowledge and acquiescence in its contractor's actions in many of these cases was "highly relevant," see United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991), to show that the contractor did not submit payment claims in deliberate ignorance or reckless disregard of their truth or falsity.[9]

The conclusion that these owners did not knowingly present false claims fits easily within the established caselaw.  The district court's opinion is persuasive:

> On this issue, the evidence positively demonstrates beyond reasonable question that at the time of

---

[8]This defense is inaptly named because it is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the "knowing" presentation of a false claim.  Inevitably, the extent of the government's knowledge is also bound up with whether the claim itself was false.  See Lamers, 168 F.3d at 1018.

[9]Courts have qualified the importance of government knowledge by stating that it may not always provide a conclusive defense to the claimant.  No case has squarely interpreted this qualification, nor need we do so.  In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false; if the claimant was colluding with the government employee to submit a false claim; or if the government's knowledge came "too late in the process," see Durcholz, 189 F.3d at 544-45.

24

defendants' submission of the challenged vouchers and HUD's approval of those vouchers, HUD, based on its own annual inspections of the property, knew full well of the very conditions of the property which it now claims made the property not "decent, safe, and sanitary." HUD, through its contract inspector, Management Solutions of America, Inc., conducted annual inspections of the Jackson Apartments for each of the years defendants' HAP Contract was in effect; and for each of the years from August 1993 to May 1997, based on conditions found to exist at the property by HUD's inspector, the apartments received "below average" or "unsatisfactory" physical inspection reports from HUD. HUD's inspector furnished to HUD's project manager responsible for the apartments a copy of his inspection report in which he detailed his specific findings and indicated repairs which needed to be made in order that the property would satisfy HUD's minimum housing quality standards. Vicki Gross, the project manager for the time period at issue, in turn, furnished the inspection report to her superiors who, in turn, forwarded the inspection reports to defendants or their managing agent, and advised defendants and/or their agent of those repairs which were required to be made and requested that defendants and/or their agent inform HUD of the actions that would be taken, along with a timetable, to correct the deficiencies which HUD had identified. At her deposition, Vicki Gross, who testified as HUD's representative, explained that properties receiving "below average" and "unsatisfactory" physical condition ratings in inspection reports are not "decent, safe, and sanitary." And indeed, the conditions upon which the Government makes its affirmative allegation that the Jackson Apartments were not in a "decent, safe, and sanitary" condition are those same specific deficiencies which HUD's inspector identified and which led him to assign the apartments the "below average" and "unsatisfactory" ratings. From this evidence, there can be no question but that HUD was fully aware of the conditions of the apartments, and specifically, of those deficiencies which it asserts made the apartments not "decent, safe, and sanitary." And yet HUD, which was aware that defendants continued to submit HAP vouchers and receive payments throughout this time, allowed those payments to continue.

Southland Mgmt. Corp., 95 F. Supp. 2d at 639-40 (emphasis added).

HUD was aware that this project was deteriorating for several years preceding its foreclosure. The types of problems

emphasized by the government as creating substandard living conditions were not hidden defects. Photographs of the property taken by the mortgagee inspectors are in the record, and HUD reviewed those inspection reports. The yearly inspection reports also show that repairs were being made regularly, and HUD knew this, as it also knew that its subsidies were insufficient to allay the deterioration. The record reflects at most the give and take between the owners and HUD over the priority of various repairs, but it does not cast doubt on the owners' investment of every penny of subsidy in the project. As the district court noted, HUD's policy of approving continued subsidy payments notwithstanding the project's declining condition was based not on its ignorance of the true condition but upon the imperative to provide housing for the tenants while HUD supervised the use of the limited funds it allocated to the project.

Further relevant to whether the owners knowingly presented false claims are the facts that HUD never informed the owners that their project was not decent, safe and sanitary and never invoked the contractual remedies for noncompliance with that standard. No regulatory or contractual definition of that standard exists. The content of the standard is far from self-evident. HUD, for its part, did not even place the project on its list of troubled properties until nine months after the period for which FCA damages are now sought. At oral argument to the en banc court, the government's attorney repeatedly failed to offer any coherent,

26

non-tautological definition of the standard. Where there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim. Lamers, 168 F.3d at 1018 ("imprecise statements or differences in interpretation growing out of a disputed legal question are . . . not false under the FCA") (citation omitted).

The government suggests that even if HUD knew something about the project's condition, the owners, who visited regularly, knew more about their noncompliance with the decent, safe and sanitary standard. This is wholly unpersuasive. The district court correctly parried this contention by pointing out that HUD now relies on exactly the deficiencies stated in its annual inspection reports to condemn the owners' certifications of compliance with the standard.[10] Whatever HUD's precise knowledge about the property, the government deemed it sufficient to threaten and then file this civil FCA case.

The civil False Claims Act is essential to policing the integrity of the government's dealings with those to whom it pays money. At the same time, the punitive treble damages and penalties afforded by civil FCA actions are not interchangeable with remedies for ordinary breaches of contract. In this case, even if the

---

[10]Indeed, the United States Attorney threatened in March 1996 to sue the owners for FCA penalties based on their false certifications, but HUD subsidies continued until the property was foreclosed in July 1998. And after that, HUD had the owners manage the apartments for another three months.

owners may have breached their contract to provide decent, safe and sanitary housing for low-income tenants, they did not knowingly present false statements to get false claims paid, and their allegedly false certifications were, under the circumstances of this case, not material to HUD's ongoing decision to subsidize the project.

For these reasons, the summary judgment for the owners was proper.